United States District Court
Southern District of Texas

**ENTERED**

May 18, 2022

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| STAN KOZLOWKSI, ET AL., | § | |
| | § | |
| Plaintiffs. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:20-cv-00365 |
| | § | |
| WILLIAM BUCK, ET AL., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before me is Defendants' Motion for Summary Judgment. Dkt. 39. Having reviewed the briefing, the record, and the applicable law, I recommend that the motion be **GRANTED**.

## BACKGROUND

This is a First Amendment retaliation suit brought by six firefighters who work, or previously worked, with the Port of Houston Authority ("Port Houston"). The six firefighters are Stan Kozlowski ("Kozlowski"), Jason Hall ("Hall"), Michael Stallings ("Stallings"), Jason Roberts ("Roberts"), Justin Meador ("Meador"), and Kyle Jordan ("Jordan") (collectively, "Plaintiffs"). This lawsuit resulted from a sequence of events that led to the termination of Kozlowski, Hall, Stallings, and Roberts, and the one-shift suspension of Jordan and Meador. Plaintiffs have sued Defendants William Buck ("Chief Buck"), the Fire Chief for Port Houston, and Marcus Woodring ("Woodring"), the Chief of Port Security and Emergency Operations Officer for Port Houston (collectively, "Defendants"), in their individual capacities.

Before digging into the facts underlying this dispute, I will first describe Plaintiffs.

## A.     THE PLAINTIFFS

As mentioned above, Plaintiffs were all firefighters with Port Houston. Kozlowski, Hall, Stallings, and Roberts all served in supervisor roles at Port Houston, managing several employees. Kozlowski and Hall were both Senior Captains, Roberts was a Battalion Chief, and Stallings was a Captain. Jordan and Meador, on the other hand, were both non-managerial firefighters who later became Driver Operators.

All six Plaintiffs were members of the International Association of Fire Fighters Local 1316, which is the local firefighters' union at Port Houston (the "Union"). Kozlowski was the Union President, Hall was the Union Vice President, Stallings was the Union Treasurer, and Jordan was the Union Secretary. Neither Roberts nor Meador ever held a leadership position in the Union.

With these preliminary facts out of the way, I turn to the dispute.

## B.     THE DISPUTE AND INVESTIGATION

The story behind this suit begins in March 2020. On March 25, 2020, Kozlowski emailed Alia O'Neill ("O'Neill") in Port Houston's Human Resources department with a request for a discussion concerning personnel issues. *See* Dkt. 39-1 at 243. In response, a meeting took place on April 3, 2020, with O'Neill (Talent Manager), Roger Walter ("Walter") (Director of Human Resources), Kozlowski, Stallings, and Luke Beard ("Beard") (a Driver Operator). During that meeting, Kozlowski, Stallings, and Beard reported that another fire department employee and Union member, Robert Jones ("Jones"), was pressuring Beard to make a false hostile-work-environment claim against Stallings. *See id*. at 15, 239–40, 245.

Following the April 3 meeting, Human Resources began to investigate the allegations made about Jones. The investigation included interviewing Meador, who had been identified as a witness to the conversation between Jones and Beard, and interviewing Jones regarding the allegations.

During his interview on April 21, 2020, Jones admitted that he had approached Beard because he saw it as an "opportunity to help someone in his previous position of being bullied and mistreated." *Id.* at 255. Later, at his deposition, Jones testified that he believed Beard was being mistreated by Stallings, who was Beard's supervisor. *See id.* at 248–49. He also clarified that in his view, "mistreatment" meant "[h]arassment, verbal assault, [and] physical assault." *Id.* at 249. In addition to addressing the treatment he saw befall Beard, Jones also told the interviewers about "mistreatment" he had allegedly suffered working at Port Houston. *See id.* at 255. Specifically, Jones raised the following complaints: (1) he was forced to disclose his military injury after being hounded and asked repeatedly by Kozlowski to do so; (2) Kozlowski hounded him to show his injury (the injury had caused him to lose a testicle), until he finally relented and showed Kozlowski a photo; (3) he and other employees were hazed; (4) physical assault; and (5) other threatening behavior from Kozlowski, including Kozlowski cleaning firearms and leaving firearms on his desk and bed at the fire station. *See id.* Jones also explained that he did not report these incidents at the time they occurred because Kozlowski had told him not trust Chief Buck or Human Resources; after he was promoted and transferred to a different station, the mistreatment continued because he was then supervised by Kozlowski's son-in-law; and bringing these allegations forward made him fearful for his own safety. *See id.* at 255–56. In the end, Walter asked Jones to write a statement fully detailing his allegations. *See id.* at 256. Jones submitted the statement on April 22, 2020. *See id.* 257–63.

After Jones's interview, another fire department employee and Union member,[1] Dennis Andrejczak ("Andrejczak"), came forward and told Chief Buck that Kozlowski had recently engaged him in a "weird" conversation. *Id.* at 271. Andrejczak stated that Kozlowski wanted to know if he had any animosity towards

---

[1] *See* Dkt. 39-1 at 277.

Kozlowski's crew or if he felt mistreated or unwelcomed by his crew. *See id.* at 273–74. Upon hearing this, Chief Buck told Andrejcak that if he felt that he "needed to say something" about anything he'd observed in his four years at Port Houston or how he'd been treated, then he should write a statement and provide it to Walter in Human Resources. *See id.* at 271–72. Andrejcak prepared a written statement and emailed it to Walter in Human Resources on April 23. *See id.* at 283–85.

Confronted with Jones's and Andrejcak's written statements, which described allegations of serious misconduct involving numerous employees over a lengthy period of time, and considering ongoing staffing issues in its Human Resources department, Port Houston decided to engage an outside investigator to take on their growing investigation. *See id.* at 240–41. In May 2020, Sandy Lauro ("Investigator Lauro") with DeDe Church & Associates was hired to conduct the investigation. *See id.* at 292 ("DeDe Church & Associates, LLC was contacted on May 1, 2020 to investigate . . . and an impartial and independent investigation commenced.").

Investigator Lauro conducted a thorough investigation of both the allegations made *about* Jones and the allegations made *by* Jones. Between May 13 and June 9, Investigator Lauro interviewed 18 witnesses (including Plaintiffs and Chief Buck). *See id.* at 288, 292. She also reviewed relevant documents. In the end, Investigator Lauro provided summary reports of the findings to Port Houston. She provided one report of her findings regarding the allegations made about Jones and one report of her findings regarding the allegations made by Jones. *See id.* at 287–95.

Concerning the allegations made about Jones, Investigator Lauro determined that her investigation: did "not support that Mr. Jones pressured Mr. Beard to file a false or frivolous hostile work environment complaint against Captain Stallings in order to get [him] or others fired"; did "not support that Mr. Jones suggested or told Mr. Beard that in order to be promoted Mr. Beard needed to file a complaint against Captain Stallings or get Captain Stallings fired"; and

4

failed to uncover "credible . . . consistently corroborating information to support that Mr. Jones referred to [a] female firefighter . . . in [a] derogatory manner." *Id.* at 289.

The allegations made by Jones are a different story. In this regard, Investigator Lauro offered the following "Summary of Allegations and Conclusions[2]":

> Mr. Jones says a group of firefighters at Port Houston engage in "hazing" or "bullying" of "rookie" firefighters by saying or doing things that are meant to be belittling or humiliating to them, such as pranks, screaming or yelling, demeaning comments and behavior, etc. Neutral and credible witnesses corroborate Mr. Jones' assertion that some firefighters at Port Houston do treat "rookie" firefighters in this manner, but one witness says the practice is becoming less common at Port Houston.[2]
>
> Mr. Jones identifies the group of individuals who allegedly treated him in this manner as Sr. Captain Kozlowski, Sr. Captain Hall, Captain Stallings, Mr. Jordan, and Mr. Justin Meador.[3] Mr. Jones also says Battalion Chief Roberts knew about his mistreatment and failed to do anything to stop it. Mr. Jones says that he was subject to "hazing" or "harassing" behavior in 2016 and 2017 by these individuals and identifies two former firefighters who were made to engage in specific alleged hazing activities.
>
> Mr. Jones appears credible in his statements that he was subject to certain unwelcome comments and behavior relating to his identified physical and/or mental disabilities and/or past military service by Sr. Captain Kozlowski, Sr. Captain Hall, Captain Stallings, Mr. Jordan, and Mr. Justin Meador. There is also general and specific corroboration from witnesses that provide support for his complaints of unwelcome comments and behavior toward him and others and that Battalion Chief Roberts knew about some of the comments and behavior. Mr. Jones' explanation for the delay in raising his concerns is credible and reasonable and there is no information that he has an improper motivation for raising the complaints. However, due to the lapse of time since 2016 and 2017, most of the information obtained and/or corroborated during the investigation relating to Mr. Jones' complaints is more general in nature than specific, with some exceptions as generally described in this report.

*Id.* at 293. In the end, Investigator Lauro concluded that Jones's "allegations are partially substantiated." *Id.* at 297.

Chief Buck, Woodring, and Tom Heidt (Chief Operating Officer) all reviewed Investigator Lauro's reports and discussed the findings with her. After reviewing and considering the findings of Investigator Lauro's investigation, the decision was

---

[2] Investigator Lauro's entire report, which contains a detailed discussion of her findings, is available at Dkt. 39-1 at 291–97. It is important to note that Plaintiffs admitted a number of the incidents underlying Jones's complaints, and others were corroborated by multiple witnesses. *See id.*; Dkt. 39 at 10–12 (offering record cites for summary judgment evidence, where applicable, further corroborating Investigator Lauro's findings that certain allegations were admitted or corroborated); Dkt. 39-1 at 25–26, 28–31, 36–37, 134–36, 156–57, 174–75, 227, 284–85.

made to terminate Kozlowski, Hall, Stallings, and Roberts, and suspend Jordan and Meador for one shift.

In July 2020, Kozlowski, Hall, Stallings, and Roberts were each terminated in separate meetings with statements tracking this pre-prepared termination script:

Termination Script For Management

Script:

Supervisor/Management Representative:

- We're here to let you know that management has decided to terminate your employment. As you know, an investigation was recently conducted regarding allegations of misconduct in the Fire Department. Based on the findings of that investigation, it was determined that you engaged in misconduct including:

    o Kozlowski: made derogatory comments about an employee's disability and veteran status, pressured an employee to disclose information and evidence of a disability, and participated in at least one hazing event.

    o Stallings: made derogatory comments about an employee's disability and participated at least one hazing event.

    o Hall: made derogatory comments about an employee's disability, pressured an employee to disclose information regarding a disability.

    o Roberts: were aware that employees under your supervision made derogatory comments about an employee's disability, pressured an employee to disclose information and evidence of a disability, and participated in at least one hazing event, and did not report the misconduct or discipline those involved.

- This conduct violates our policies and core values, including your responsibilities as a manager, and your employment with the Port Authority has therefore been terminated effective immediately.

*Id.* at 338. *See also id.* at 11–14, 114–15, 143–44, 180–83, 241. Jordan and Meador were also told the reasons for their one-shift suspensions, which were also documented in the Disciplinary Notices that each received. *See id.* at 340, 342.

Following their terminations and suspensions, Plaintiffs sought to overturn their punishments by utilizing the Port Houston Employee Dispute Resolution Process. At the first step of review, Plaintiffs made their case to the Managerial Review Committee (the "Committee"). After a hearing and several days of deliberation, the Committee upheld all six employment decisions. *See id.* at 241. Plaintiffs then appealed the Committee's decision to Roger Guenther ("Director Guenther"), the Executive Director of Port Houston. After reviewing related

documents, speaking with Plaintiffs, and otherwise weighing the facts, Director
Guenther upheld the Committee's decisions. *See id.* at 418–23.

After exhausting the administrative process, Plaintiffs filed this lawsuit
against Defendants under 42 U.S.C. § 1983, alleging that Defendants terminated
or suspended their employment in retaliation for exercising their First
Amendment rights to freedom of speech and freedom of association.[3] In advancing
these claims, Plaintiffs rely on their status as Union members. Specifically,
Plaintiffs contend that:

> Prior to Defendants' retaliation, the Port Firefighter Union leaders
> actively spoke out and lobbied for changes within Port Houston, as
> part of their constitutional rights and duties in the leadership of IAFF
> Local 1316. Specifically, the Port Firefighter Union leaders advocated
> to Port Houston upper management and Human Resources (1) to
> address pay parity for Department members as union officers and
> members, (2) to express their concerns regarding morale and
> turnover in the Department, and (3) to modify the shift schedule to a
> 48/96 shift. Notably, Chief Buck and others in the upper
> administration at Port Houston actively opposed these measures. In
> addition, as union officials, the Port Firefighter Union leaders also
> represented firefighters accused of wrongdoing, including opposing
> and advocating against upper management's disciplinary decisions
> for those firefighters. Undisputedly, the Port Firefighter Union leaders
> had a right to engage in this protected activity as part of their right to
> associate and free speech protected under the First and Fourteenth
> Amendments.

Dkt. 43 at 9–10 (footnotes omitted). Plaintiffs further allege that in addition to
their Union activities, Chief Buck "called the Union Leaders a cancer, targeted the
union leaders, and Buck had previously stated that he 'left the union' because he
felt that 'upper management wouldn't approve a new member of the union.'" *Id.* at
21 (cleaned up). In sum, Plaintiffs aver that their involvement advocating for the
Union was the actual reason they were terminated and suspended, as opposed to
Investigator Lauro's findings.

---

[3] Plaintiffs also filed a lawsuit in Harris County District Court, asserting state-law claims.

Defendants have now moved for summary judgment.

## SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *See Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834, 837 (S.D. Tex. 2017).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once satisfied, the burden shifts to the nonmovant to show the existence of a genuine fact issue for trial. *See id.* at 324. To do so, the "nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015).

In ruling on a motion for summary judgment, I must construe "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020). On cross-motions for summary judgment, I review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

## ANALYSIS

A.    FIRST AMENDMENT RETALIATION

Defendants argue for several reasons that Plaintiffs cannot establish a prima facie case for either of their First Amendment retaliation theories—i.e., freedom of association and freedom of speech. I will address the arguments below. But to set the stage for that discussion, I begin with the appropriate legal standards.

### 1. Legal Standards

The Fifth Circuit "articulates slightly different standards depending on whether a retaliation claim turns on a plaintiff's union-related speech or association." *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, 9 F.4th 328, 331 (5th Cir. 2021).

A freedom-of-speech claim based on union-related speech requires Plaintiffs to show that: (1) they suffered an adverse employment action; (2) they spoke as a citizen on a matter of public concern; (3) their interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action. *See Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016).

A freedom-of-association claim based on union association requires Plaintiffs to show that: (1) they suffered an adverse employment action; (2) their associational interest outweighed the government's interest in efficiency; and (3) their protected activity was a substantial or motivating factor in the adverse employment action. *See Hitt v. Connell*, 301 F.3d 240, 246 (5th Cir. 2002).

"Both standards, however, require a causal relationship between the protected activity and the adverse employment action." *Anderson*, 9 F.4th at 331. *See also Garza v. Escobar*, 972 F.3d 721, 728–29 (5th Cir. 2020) (First Amendment retaliation plaintiff must present proof that he suffered adverse employment action "because of" speech or activity related to a matter of public concern (quotation omitted)). If a plaintiff makes this showing, both claims permit an affirmative defense, known as the "*Mt. Healthy* defense," through which the employer may avoid liability by "showing a legitimate reason for which it would have discharged the employee even in the absence of his protected conduct." *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Finally, a plaintiff may rebut an employer's *Mt. Healthy* defense by showing the employer's proffered reason is pretextual. *See Haverda v. Hays Cnty.*, 723 F.3d 586, 592 (5th Cir. 2013).

### 2. *The Causal Relationship*[4]

Defendants contend that Plaintiffs cannot establish a prima facie freedom-of-association or freedom-of-speech claim because Plaintiffs cannot show a causal relationship between their union-related activity and speech and the adverse employment actions (i.e., the terminations and suspensions). Plaintiffs disagree, identifying two types of evidence they believe satisfy their causation burden: (i) the temporal proximity between their purported protected activity and the adverse actions they faced; and (ii) a chronology of events from which retaliation may plausibly be inferred. *See* Dkt. 43 at 17–18 (citing *Mote v. Walthall*, No. 4:16-CV-00203, 2017 WL 2651705, at *6 (E.D. Tex. June 20, 2017)). Defendants do not dispute that this type of evidence can satisfy Plaintiffs' causation burden; Defendants simply argue that no such evidence has been presented here.

I agree with Defendants.

### i. Temporal Proximity

"Close timing between an employee's protected activity and an adverse action against him may provide the causal connection required to make out a prima facie retaliation case." *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019) (cleaned up).

To decide the issue of temporal proximity, two dates are important: (1) the date of the protected activity; and (2) the date of the adverse action. Here, it is undisputed that the adverse employment actions—i.e., the suspensions and

---

[4] In the Motion for Summary Judgment, citing *Jones v. Hosemann*, 812 F. App'x 235, 238–39 (5th Cir. 2020), Defendants argue that Plaintiffs' suit should be dismissed because "they cannot demonstrate that either of the Defendants, individually, each took actions that caused Plaintiffs harm." Dkt. 39 at 21. In other words, Defendants contend that Plaintiffs failed to adequately allege individual causation. In my view, this argument is essentially an argument appropriate for a motion to dismiss. Indeed, the Fifth Circuit in *Jones* reviewed a district court's denial of Jones's motion to dismiss. *See* 812 F. App'x at 237. In this case, given the procedural posture, I think the more prudent thing to do is address the causation issue on the merits. *See Marusak v. Sema Constr., Inc.*, No. 4:21-CV-00475-P-BP, 2021 WL 6135429, at *1 (N.D. Tex. Dec. 28, 2021) ("Federal courts prefer deciding cases on their merits rather than their pleadings.").

terminations—occurred in July 2020. The specifics surrounding Plaintiffs'
purported protected activity, however, are less than clear.

As mentioned above, Plaintiffs generally claim that they engaged in multiple
union-related protected activities, which included advocating to Port Houston
upper management and Human Resources: "(1) to address pay parity for
Department members as union officers and members, (2) to express their concerns
regarding morale and turnover in the Department, and (3) to modify the shift
schedule to a 48/96 shift." Dkt. 43 at 9–10. Defendants also claim that they
"represented firefighters accused of wrongdoing, including opposing and
advocating against upper management's disciplinary decisions for those
firefighters." *Id.* at 10. Although Plaintiffs list these supposed protected activities
in their factual background section, they fail to identify the date on which each
occurred. And while Plaintiffs cite their own declarations in support of the factual
statements, *see id.* at 10 n.32–34, the declarations likewise do not offer dates for
the purported protected activities.[5] *See* Dkt. 44 at 7–43. Obviously, without dates
for the protected activities, I am unable to consider whether there is sufficient
temporal proximity to infer a causal connection.

Moreover, it is unclear to me that Plaintiffs are even attempting to rely on
all the purported protected activities identified in the factual background section
of their brief. I say this because Defendants forcefully challenge temporal
proximity in their Motion for Summary Judgment, but in responding to those
arguments, Plaintiffs only discuss one of the purported protected activities: their
advocacy to modify the shift schedule to a 48/96 shift. *See* Dkt. 43 at 17–29. For

---

[5] Defendants' briefing and evidence indicate some of Plaintiffs' claimed protected activities
occurred in 2015 and 2018. *See* Dkt. 39 at 16. *See also* Dkt. 39-1 at 42–45, 54–57, 80–81, 84–85,
124–26. Even taking that evidence into consideration, those dates are too far removed from the
suspensions and terminations to demonstrate temporal proximity. *See, e.g., Raggs v. Miss.
Power & Light Co.*, 278 F.3d 463, 471–72 (5th Cir. 2002) (finding five-month gap alone
insufficient); *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting that a district
court in this circuit has found that "a time lapse of *up to four months* has been found sufficient"
(quotation omitted and emphasis added)).

the remainder of my opinion, I will proceed with the understanding that the advocacy for the 48/96 shift change is the lone protected activity. Focusing on the shift change, however, is still problematic.

Although Plaintiffs' response and supporting declarations do not provide a date for their shift-change advocacy, Plaintiffs Third Amended Complaint states that "between 2015 and 2020, Plaintiffs spoke out and openly advocated to utilize a 48/96 shift change," meaning the advocacy began some five years before the adverse employment actions. Dkt. 30-1 at 12. Nonetheless, no matter when the advocacy began, it certainly ended once the decision was made to adopt the shift change. Defendants have submitted summary judgment evidence that the shift change was adopted and announced on October 1, 2019—though it did not go into effect until January 2020. *See* Dkt. 49-1 at 2. This means the protected activity (the shift change adopted and announced on October 1, 2019) occurred approximately nine months prior to the adverse employment actions in July 2020. A nine-month gap is too great to show causation by itself. *See, e.g.*, *Raggs*, 278 F.3d at 471–72 (finding five-month gap insufficient).

Consequently, by itself, the timing between Plaintiffs' shift-change advocacy and their suspensions and terminations is not close enough to permit a plausible inference that the adverse employment actions were causally connected to Plaintiffs' union-related protected activity.

### ii. Chronology of Events

Plaintiffs next attempt to present a chronology of events from which retaliation may plausibly be inferred.

"This circuit . . . allow[s] plaintiffs to show causation by relying on a chronology of events from which retaliation may plausibly be inferred." *Benfield*, 945 F.3d at 338 (quotation omitted). To satisfy this burden, Plaintiffs must "bridge th[e] gap" between their protected activity and the suspensions and terminations "with a chronology of events that permits" me to infer Defendants' retaliatory motive. *Id.* Importantly, Plaintiffs cannot do this "without stating with specificity

when" the protected activity, intervening chronology of events, and adverse employment actions occurred. *Id.* This is so because I must be able to ensure that the alleged chronology of events "continue[d] periodically throughout" the gap between Plaintiffs' protected activity and their suspensions and terminations. *Id.* Otherwise, I will "be unable to plausibly infer that [the identified events] are part of a causally connected string of events stemming from [Plaintiffs' protected activity]." *Id.*

> In their own words, Plaintiffs describe the chronology of events as follows:
>
> Buck set in motion the events that led to the Union leaders' termination and disciplinary action. Buck expressed negative comments regarding the union members, including referring to them as a "cancer." Buck also opposed the shift change. Buck then pushed Jones to initiate the complaint process, directly after the shift change went into effect. At the same time, Buck told Jones to hide Buck's knowledge/participation of the complaint. Worse yet, after the investigation started, Buck told the investigator that the Union Leaders were a cancer, provided his own informal investigation to her, and Port Houston flagged the leaders as part of the union. Ultimately, Buck and Woodring participated in the decision to fire Kozlowski, Stallings, Hall, and Roberts, and suspend Meador and Jordan. As a result, it is of no moment that others participated in the termination of the Union Leaders because Buck and Woodring caused the termination.

Dkt. 43 at 15 (footnotes omitted). This chronology is insufficient to meet Plaintiffs' burden.[6]

To begin, Plaintiffs' chronology claims that Chief Buck set everything into motion by expressing negative comments about members of the Union, "including referring to them as a 'cancer.'" *Id.* This alleged starting point is unconvincing.

---

[6] Although Plaintiffs have sued Woodring, their Response to Defendants' Motion for Summary Judgment does not identify any action taken by Woodring other than his participation in making the ultimate termination decision. In this regard, Plaintiffs fail to attribute any of the actions making up the supposed chronology of events to Woodring. Defendants argue that "[f]or this reason alone, all claims against Woodring should be dismissed." Dkt. 49 at 7. While I believe this argument is strong, in the interest of bending over backwards for Plaintiffs, I choose to address the overall merit of the chronology-of-events argument.

Plaintiffs do not offer a date for when Chief Buck allegedly "expressed negative comments regarding the union members." *Id.* Thus, I am unable to make any inferences based on this assertion.

The claim that Chief Buck referred to certain Union members as a "cancer" is a bit different, but still unpersuasive, and ultimately fatal to Plaintiffs' claims. Citing Jones's deposition testimony, Plaintiffs argue that "during th[e] same time period that Plaintiffs actively engaged in protected association, [Chief] Buck repeatedly referred to the Union leaders as a 'cancer.'" *Id.* at 22 (citing Dkt. 44 at 192–93). While the cited deposition testimony does recount that Chief Buck referred to certain Union members as a "cancer within the department," Dkt. 44 at 192, it does not specifically identify when this alleged conversation occurred. In fact, when Plaintiffs' counsel asked about the timing, Jones could only muster a guess: "I think it was well before, but it was a long time ago, but I'm pretty sure it was sometime before that I was sent to go check on Beard." *Id.* at 193. Homing in on this amorphous testimony, Defendants' counsel cut right to the heart of the matter, asking Jones:

> Q.  And what were you talking about in that conversation where he referenced certain individuals as a cancer?
>
> A.  He told me that he had just completed his interview with the first investigator, Ms. Sandy, and he told me that he told her that they were a cancer within the department.
>
> Q.  Okay. Before that, had Chief Buck ever referred to any individuals as a cancer?
>
> A.  Not to my knowledge.
>
> Q.  And do you know -- well, let me ask you: that conversation where he tells you that he had told Sandy Lauro that certain individuals were a cancer, did he say who specifically he was referring to?
>
> A.  He just said those guys.

14

*Id.* at 215.[7]

While this testimony does not offer a date, it includes a key fact: Chief Buck used the "cancer" terminology during and after his interview with Investigator Lauro. As mentioned above, Investigator Lauro conducted all her interviews between May 13 and June 9, 2020, meaning Chief Buck first used the term "cancer" sometime during that period. *See* Dkt. 39-1 at 288, 292. This undercuts the notion that after Chief Buck referred to the Union members as a "cancer," he "*then* pushed Jones to initiate the complaint process, directly after the shift change went into effect." Dkt. 43 at 15 (emphasis added). Recall, contrary to Plaintiffs' alleged chronology of events, Jones first asserted his complaints to Port Houston's Human Resources department when they interviewed him about the complaints made by Kozlowski, Stallings, and Beard *on April 21, 2020. See id.* at 255. Obviously, Chief Buck's conduct that occurred sometime between May 13 and June 9, 2020, could not precede Jones's complaints in April 2020. This inconsistency also reveals another inconsistency. Although Plaintiffs' chronology claims that Jones "initiate[d] the complaint process," Dkt. 43 at 15, the summary judgment evidence is clear that Jones did not *initiate* the complaint process. Rather, Jones only became involved after Kozlowski, Stallings, and Beard reported that Jones was pressuring Beard to make a hostile-work-environment claim against Stallings. *See* Dkt. 39-1 at 239–240, 245. In other words, Kozlowski, Stallings, and Beard initiated the complaint process.

There are more inconsistencies in Plaintiffs' purported chronology of events, but I need not reach those. Based on the facts I've laid out, Plaintiffs simply have not put forth a chronology that bridges the gap between their protected activity— the shift change that was adopted and announced on October 1, 2019—and their suspensions and terminations in July 2020. While the date Investigator Lauro interviewed Chief Buck is not definitively stated, the date could have been no

---

[7] "Ms. Sandy" is Investigator Lauro.

earlier than May 1, 2020—the date that DeDe Church & Associates was contacted. *See* Dkt. 39-1 at 292 (stating that DeDe Church & Associates "was contacted on May 1, 2020" and the "investigation commenced on May 5, 2020"). This supposed starting date is approximately seven months after the shift change was adopted and announced. If a seven-month gap is too long to show causation by itself, *see Raggs*, 278 F.3d at 472 (finding five-month gap alone insufficient), it is certainly too wide to be ignored for purposes of demonstrating a causal relationship through a chronology of events.

***

In sum, Plaintiffs have not shown a fact issue exists as to the causal relationship between their advocacy for the 48/96 shift change and their terminations and suspensions. Accordingly, Plaintiffs have failed to support an element of their First Amendment retaliation claim.[8]

I am mindful of the Fifth Circuit's guidance that "summary disposition of the causation issue in First Amendment retaliation claims is generally inappropriate," *Haverda*, 723 F.3d at 595, but here Plaintiffs have not come forward with summary judgment evidence showing a genuine issue for trial. *See Coleman v. BP Expl. & Prod., Inc.*, 19 F.4th 720, 726 (5th Cir. 2021) ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and

---

[8] Defendants have objected to certain portions of Plaintiffs' summary judgment evidence. *See* Dkt. 51. Specifically, Defendants object to a declaration and report offered by Kim Harris ("Harris"), an expert witness designated by Plaintiffs, because many portions of the declaration are purportedly not based on Harris's personal knowledge. Defendants also object to the Investigator Sonnier's Summary Investigation Report, as well as Plaintiffs' inclusion of entire deposition transcripts. *See id.* at 2–5. I find that this evidence does not lend support to Plaintiffs' purported chronology of events. Thus, I deny Defendants' objections as moot because "this evidence does not affect the disposition of the summary judgment motion." *Lilly v. SSC Houston Sw. Operating Co. LLC*, No. 4:20-CV-03478, 2022 WL 35809, at *3 n.2 (S.D. Tex. Jan. 4, 2022). *See also Banks v. Bell Helicopter Textron, Inc.*, No. 4:10-CV-653-Y, 2011 WL 13291576, at *4 (N.D. Tex. Nov. 4, 2011) ("Bell also raises objections to Banks's summary-judgment evidence. But because Bell is entitled to judgment as a matter of law even considering the objected-to evidence, the Court overrules Bell's objections as moot."); *Jones v. United Parcel Serv., Inc.*, No. 3:06-CV-1535-L, 2008 WL 2627675, at *6 (N.D. Tex. June 30, 2008) (denying objections to summary judgment evidence as moot because the evidence was "not central to the court's conclusions, and sustaining the parties' objections would not change the result"), *aff'd*, 307 F. App'x 864 (5th Cir. 2009).

16

legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." (quotation omitted)); *Logan v. Dall. Cnty.*, 331 F. Supp. 3d 640, 644 (N.D. Tex. 2017) ("The Court acknowledges that summary judgment should be used sparingly in First Amendment cases, *Haverda*, 723 F.3d at 592, but believes this is one of those few cases where it is merited."). Accordingly, in my view, Defendants are entitled to summary judgment.[9]

### 3. *Mt. Healthy Defense and Qualified Immunity*

Defendants have presented arguments in support of their *Mt. Healthy* defense, as well arguments in favor of qualified immunity. Because Plaintiffs have failed to present a prima facie First Amendment retaliation claim, I need not reach those arguments. *See Lewis v. Panola Cnty.*, No. 3:20-CV-223-DMB-RP, 2022 WL 619661, at *8 n.17 (N.D. Miss. Mar. 2, 2022) ("Because the Court has already concluded that no constitutional violation has occurred, it need not address whether [Defendants were] entitled to qualified immunity." (cleaned up)); *Perna v. Twp. of Montclair*, 409 F. App'x 581, 584 n.4 (3d Cir. 2011) (explaining the court need not address a defendant's *Mt. Healthy* argument where district court granted summary judgment for defendant based on causation prong).

### CONCLUSION

For the reasons explained above Defendants' Motion for Summary Judgment (Dkt. 39) should be **GRANTED**.

Because I am recommending that Defendants' Motion for Summary Judgment be granted, I also recommend that: (1) Plaintiffs' Motion for Leave to File Documents Designated Confidential under the Court's Protective Order (Dkt. 46) be **GRANTED**; (2) Defendants' Motion to Strike Plaintiffs' Human Resources

---

[9] This result is bolstered by Defendants' summary judgment evidence. Specifically, Defendants have shown that even though Plaintiffs claim their Union activities began in 2015, Plaintiffs enjoyed successful careers at Port Houston, obtaining regular promotions and pay increases up until their misconduct was unearthed by Investigator Lauro. *See* Dkt. 39-1 at 7–9, 88, 110–12, 140–41, 176–77, 209, 222. Moreover, the summary judgment evidence establishes that Chief Buck encouraged Stallings to join the Union. *See id.* at 148. All of this tends to belie any negative animus towards Plaintiffs' Union membership.

Expert Kim Harris (Dkt. 50) be **DENIED** as moot; and (3) Defendants' Motion to Strike Plaintiffs' Attorney's Fee Expert Terence L. O'Rourke (Dkt. 57) be **DENIED** as moot.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections under Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED this 18th day of May 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE